# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

MEDTRONIC, INC. & CONSOLIDATED SUBSIDIARIES,

*Appellee/Cross-Appellant*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Appellant/Cross-Appellee.*

On Appeal from the Decision of the United States Tax Court

## REPLY BRIEF FOR THE CROSS-APPELLANT

RAJIV MADAN
SKADDEN, ARPS, SLATE, MEAGHER,
  FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
(202) 371-7020

NOAH A. LEVINE
ALEX W. MILLER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
noah.levine@wilmerhale.com

June 6, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ............................................................................. 1

ARGUMENT ..................................................................................... 4

I.  WHEN A CUT EXISTS, IT IS GENERALLY THE BEST METHOD ......................... 5

II. THE PACESETTER AGREEMENT IS A CUT AND MORE RELIABLY
    VALUES THE INTANGIBLE PROPERTY THAN THE CPM ..................................... 8

    A.  The CUT regulations require "comparable" property and
        "similar" profit potential, not an identical transaction ....................... 11

    B.  The Pacesetter Agreement is a CUT .............................................. 15

        1.  The Pacesetter Agreement and Medtronic P.R.
            license involved comparable property ...................................... 15

        2.  The property licensed in the Pacesetter Agreement
            and to Medtronic P.R. had similar profit potential .................. 18

        3.  Medtronic P.R.'s relative share of overall costs
            does not undermine comparability or violate the
            "commensurate with income" requirement .............................. 20

    C.  The Commissioner's CPM is less reliable than
        Medtronic's CUT ..................................................................... 21

III. MEDTRONIC'S UNSPECIFIED METHOD IS THE NEXT BEST
     METHOD ................................................................................... 27

CONCLUSION ................................................................................ 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Appellate Case: 23-3281   Page: 2   Date Filed: 06/06/2024 Entry ID: 5401532

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Amazon.Com, Inc. v. C.I.R.*, 148 T.C. 108 (2017)....................................................13

*Coca-Cola Co. & Subsidiaries v. C.I.R.*, 155 T.C. 145 (2020) .......................7, 8, 23

*Medtronic, Inc. v. C.I.R.*, 900 F.3d 610 (8th Cir. 2018) .................................4, 6, 14

*Veritas Software Corp. v. C.I.R.*, 133 T.C. 297 (2009) ...........................................13

## RULES AND REGULATIONS

Fed. R. App. P. 28.1 .......................................................................................................5

26 C.F.R.
    § 1.482-1 .....................................................................................*passim*
    § 1.482-4 ....................................................................11, 12, 15, 27
    § 1.482-5 ........................................................................22, 25, 30
    § 1.482-8 .....................................................................................4

59 Fed. Reg. 34,971 (July 8, 1994).......................................4, 6, 13, 20, 22

## OTHER AUTHORITIES

Cantley, Beckett & Geoffrey Dietrich, Coca-Cola v. Commissioner*: A
    Major IRS Win in the International Transfer Pricing Wars*,
    25 Transactions: The Tenn. J. of Bus. L. 17 (2023).......................................7

Appellate Case: 23-3281    Page: 3    Date Filed: 06/06/2024    Entry ID: 5401532

# INTRODUCTION

The Commissioner no longer contests the central issues that occupied the parties, Tax Court, and this Court during more than a decade of litigation, including most of what led this Court to vacate and remand the Tax Court's decision adopting Medtronic's CUT. With its current arguments, the IRS brief instead reveals why either of Medtronic's proposed methods are better than the IRS's CPM. The Pacesetter Agreement is direct transfer-pricing evidence, demonstrating the arm's-length value that three independent parties—Medtronic, Pacesetter, and St. Jude—assigned to the same core patents licensed to Medtronic P.R., into the same tax years at issue. That the Medtronic P.R. license involved some additional, less-valuable intangible property too, used only in conjunction with those same patents, does nothing to disturb comparability. This Court should reverse and order the Tax Court to apply Medtronic's CUT or, in the alternative, Medtronic's unspecified method.

With the Commissioner's second brief, this appeal now barely resembles the two Tax Court proceedings or the positions the Commissioner took therein. Those trials focused on whether the circumstances of the Pacesetter Agreement distinguished it from the Medtronic P.R. license, supposed differences in the patents licensed to Pacesetter and Medtronic P.R., and whether those patents were "crown jewels" primarily responsible for the success of Medtronic's Devices and

Appellate Case: 23-3281    Page: 4    Date Filed: 06/06/2024 Entry ID: 5401532

Leads.  But that was then.  The Commissioner no longer disputes that Medtronic US licensed the same core patents to Medtronic P.R. and Pacesetter under comparable circumstances, these patents were not "crown jewels," and Medtronic P.R.'s role in ensuring quality was a substantial driver of Medtronic's success.

The Commissioner's present arguments against Medtronic's CUT are narrow, resting on a newly discovered view that, actually, the "crown jewels" of the license were the less-important, *non-patent* intangibles, and on an asserted difference in profit potential between the Pacesetter Agreement and the Medtronic P.R. license.  But the undisputed record and well-supported Tax Court findings demonstrate that the *patents*—which the Commissioner effectively concedes can be priced by starting with the Pacesetter Agreement—were far more valuable than the non-patent intangibles, which themselves derived value only in connection with the patents.  Nothing supports the Commissioner's eleventh-hour, "tail wags the dog" argument that it was, in fact, know-how and other non-patent intangibles that constituted the most valuable part of the Medtronic P.R. license, or (going to the CUT method) that they were so important as to render the agreements (licensing the *same* core patents into the *same* tax years) somehow *in*-comparable.  The profit potential of the agreements was also similar, given the terms of the Pacesetter Agreement, the other intercompany agreements the Commissioner concedes are at

- 2 -

arm's-length terms, and the importance of Medtronic P.R.'s contributions to the enterprise.

Neither of the Commissioner's arguments comes close to undermining the value of Medtronic's CUT, especially *when compared to* the Commissioner's CPM. Ignoring the significant narrowing of this litigation and the Tax Court twice finding the CPM arbitrary and capricious, the IRS continues to press the same methodology it does in nearly every transfer-pricing case. But any CPM would be ill-suited to the circumstances here, where Medtronic P.R. undisputedly possessed its own high-value intangibles, making it impossible to isolate Medtronic P.R. as the simple-to-test party required for a *reliable* CPM. The Commissioner's case-specific CPM is still worse, looking to integrated conglomerates producing a range of products and performing a range of functions that in no way resemble Medtronic P.R., then using a profit-level indicator the Tax Court found uniquely inappropriate for the precision medical device industry.

Finally, even if the Court were to credit the Commissioner's argument that the Pacesetter Agreement could not be a CUT—and the Court should not—no caselaw or regulation precludes its use as a building block for an unspecified method. By their terms, the regulations the Commissioner cites do not apply to unspecified methods. The Pacesetter Agreement provides the only direct, probative evidence of the value of the core intangible property; any interpretation

- 3 -

that would preclude its use contravenes "the emphasis on comparability, and the resulting flexibility" at the heart of the regulatory scheme. 59 Fed. Reg. 34,971, 34,975 (July 8, 1994).

As this Court held, "[i]f uncontrolled transactions involve the same or comparable intangible property, then the CUT method will generally yield the most reliable arm's length measurement." *Medtronic, Inc. v. C.I.R.*, 900 F.3d 610, 614 (8th Cir. 2018). If the Court correctly concludes that the Pacesetter Agreement involved comparable property, that decides the case—the CUT is the best method, and this litigation can finally end.

## ARGUMENT

The issues on appeal concern the "best method" for valuing the license of intangible property from Medtronic US to Medtronic P.R. 26 C.F.R. § 1.482-1(c). The best method must be "more reliable than any other available measure of the arm's length result." § 1.482-8(a). And, although "[a]n arm's length result may be determined under any method without establishing the inapplicability of another method," if one method "is shown to produce a more reliable measure of an arm's length result, [that] method must be used." § 1.482-1(c). That means a "comparative analysis is required." § 1.482-8(a).

Here, the regulations and extensive Tax Court findings (to say nothing of common sense) demonstrate that Medtronic's CUT is more reliable than the CPM

- 4 -

or an unspecified method.  Medtronic's CUT is based on a competitively negotiated license of the same core patents into the same tax years, with a value determined and confirmed by three different competitors.  But even if the CUT were not the best method, an unspecified method incorporating the direct evidence provided by the Pacesetter Agreement is permitted by the regulations and more reliable than the CPM.[1]

## I.  WHEN A CUT EXISTS, IT IS GENERALLY THE BEST METHOD

The Commissioner continues to oppose Medtronic's CUT by wrongly insisting the CPM is the "method of first resort" for pricing transfers of intangible property unless the compared transactions involve "'the *same* intangible.'" CIR.Response/Reply 5-6 (emphasis added).  That is not the law.

To start, it bears noting that the Commissioner somehow makes this argument while simultaneously criticizing *Medtronic* for assertedly presenting an "imagined hierarchy of transfer-pricing methods."  CIR.Response/Reply 4.  Not so. Medtronic acknowledged "there is no *strict* priority of methods, and no method will *invariably* be considered to be more reliable than others."  Medtronic Br. 11-12 (quoting § 1.482-1(c)(2)) (emphasis added).  Nevertheless, Medtronic argued, as

---

[1]    Given the comparative inquiry required by the regulations, "the issues presented by [Medtronic's] cross-appeal" necessarily involve a comparison of all three methods considered by the Tax Court, and thus are properly addressed in this brief.  Fed. R. App. P. 28.1(c)(4).

- 5 -

this Court already held, that "[i]f uncontrolled transactions involve the same or comparable intangible property, then *the CUT method* will *generally* yield the most reliable arm's length measurement." Medtronic Br. 12 (quoting *Medtronic*, 900 F.3d at 614) (emphasis added). The regulations, moreover, state that "the results of transactions between unrelated parties"—that is, a CUT—offer "the most objective basis for determining whether the results of a controlled transaction are arm's length." § 1.482-1(c)(2). It is the Commissioner, not Medtronic, who now distorts the law by claiming that it prefers his method.

The Commissioner has no answer to Medtronic's arguments regarding why the CUT is preferable to a CPM here. The Commissioner concedes "the CUT method directly values the intangibles," whereas the CPM only "valu[es] the intangibles indirectly." CIR.Opening Br. 7-8. And it is the IRS (not Treasury) that stated (not speculated) "the CPM generally would be considered a method of last resort," and that *removed* from the final regulations "language providing that the CPM 'ordinarily will provide an accurate measure of an arm's length result.'" 59 Fed. Reg. at 34,985. Instead, as the IRS itself put it, because "methods that determine an arm's length price" directly (like a CUT) "generally achieve a higher degree of comparability than the CPM," "the results of these methods will be selected unless the data necessary to apply them is relatively incomplete or unreliable." *Id.*

- 6 -

The Commissioner's contrary arguments rely on neither the regulations' text nor preamble, but the asserted frequency with which the IRS uses the CPM in negotiated (not litigated) valuations and a misreading of a single Tax Court decision that does not bind this Court. CIR.Response/Reply 6-7. As to the former, taxpayers' negotiated acquiescence to the Commissioner's preferred method is understandable (the alternative apparently being a decade of litigation). But it is not the law. As to the latter, *Coca-Cola* appears to be the *only* transfer-pricing case endorsing a CPM over a CUT and involved a "unique fact pattern" that made Coca-Cola's operations "more susceptible to CPM analysis than other cases." Cantley & Dietrich, Coca-Cola v. Commissioner*: A Major IRS Win in the International Transfer Pricing Wars*, 25 Transactions: The Tenn. J. of Bus. L. 17, 31 (2023). Even then, *Coca-Cola* acknowledged that the CUT "will be selected unless the data necessary to apply ... [the CUT method are] relatively incomplete or unreliable," and held it would evaluate the CPM "with no thumb on the scale in favor of or against that methodology." *Coca-Cola Co. & Subsidiaries v. C.I.R.*, 155 T.C. 145, 212-213 (2020). The supposedly contrary statement the Commissioner emphasizes—that "the most reliable transfer pricing method is often one that avoids any direct valuation of those intangibles"—is an isolated aside and

- 7 -

supported not by precedent or regulation, but the observations of a single

commentator.  *Id.* at 218.[2]

The Commissioner's argument regarding a hierarchy of methods thus turns

on whether sufficient information exists to apply the CUT.  If it does—as here—

the IRS's own regulations and guidance agree the CUT should be adopted over the

CPM.

## II. THE PACESETTER AGREEMENT IS A CUT AND MORE RELIABLY VALUES THE INTANGIBLE PROPERTY THAN THE CPM

The Commissioner's striking retreat from multiple positions illustrates well

why a CUT is the best method here.  For example:

- The Commissioner now largely concedes the Pacesetter Agreement

  reliably measures the value of *the patents* licensed to Medtronic P.R.

  *Compare* CIR.Response/Reply 26 (describing Pacesetter Agreement

  as "actual price that Medtronic charged for a *subset* of its intangible

  property" licensed to Medtronic P.R.), *with* Add.182 ("[IRS] contends

  that the Pacesetter agreement was not a CUT because the patent

  licenses were not comparable.").

---

[2]      Relying on commentary rather than law also features prominently in the Commissioner's briefs.  *See, e.g.*, CIR.Response/Reply 5, 18, 34, 37, 40, 65 (citing three blog posts from a single author criticizing the decision below and Medtronic's brief); *see also* CIR.Opening Br. 35, 51, 61 (citing same author).

- 8 -

- The Commissioner does not contest that Medtronic P.R. paid Medtronic US arm's-length prices for functions that Pacesetter performed itself. *Compare* CIR.Response/Reply 30 (acknowledging additional intercompany agreements covered "Medtronic's distribution and component-manufacturing functions and the use of its trademarks"), *with* Med.Supp.App.7-8 (arguing Pacesetter Agreement is not a CUT because Pacesetter performed "distribution," "component manufacturing," and "trademark" "activities").

- The Commissioner completely abandoned arguments that the circumstances of the Pacesetter Agreement or its payment terms materially distinguish it from the disputed Medtronic P.R. license. *Compare* CIR.Response/Reply 24 (admitting "circumstances of the Pacesetter Agreement and the Intercompany-Licenses may have been comparable in part" and making no additional argument), *with* Med.Supp.App.29 ("There were important differences in economic circumstances between the MPROC and Pacesetter Agreements").

- The Commissioner acknowledges the preeminent role that quality plays in Medtronic's success. *Compare* CIR.Response/Reply 10 ("[P]roducing high quality products was key to [Medtronic's]

success"), *with* Med.Supp.App.18-20 ("Quality is not the primary driver of success and profits at Medtronic").

The Commissioner makes these concessions because the evidence compels them. As Medtronic explained, the proposed CUT meets all the comparability factors, and the Tax Court erred in concluding otherwise. Medtronic Br. 41-55.

The Commissioner's *current* challenge to Medtronic's CUT thus reduces to two arguments, both of which are again belied by the regulations and record. *First*, the regulations flatly contradict the contention that the Pacesetter Agreement is categorically ineligible to serve as a CUT simply because Medtronic P.R. licensed some other intangible property along with the core patents. *Second*, the Commissioner's asserted differences in profit potential are illusory and, even if they existed, could be accounted for with adjustments. The CPM, by contrast, provides no reliable information about the value of the property licensed to Medtronic P.R. and is incapable of capturing a profit potential to which the Tax Court found Medtronic P.R. uniquely contributed.[3]

---

[3] The Commissioner purports to defend the Tax Court's "functional differences" finding, but now defends only one difference—R&D. CIR.Response/Reply 29-31. The Commissioner's property and functional-differences arguments thus converge and fail for the same reasons. *See* Medtronic Br. 48-49.

- 10 -

### A. The CUT regulations require "comparable" property and "similar" profit potential, not an identical transaction

The Commissioner's primary argument is that the Pacesetter Agreement is ineligible to be a CUT because, he asserts, a comparable transaction "must" involve "either the same intangible property or comparable intangible property" with "similar profit potential," and the Pacesetter agreement does not. *E.g.*, CIR.Response/Reply 18.[4] Medtronic has never disputed that these are "requirements," but, as Medtronic has explained, the Tax Court's findings and the extensive record demonstrate the Pacesetter Agreement meets both requirements. *See infra* pp.15-21; *see also* Medtronic Br. 41-55.

The Commissioner also challenges whether adjustments may ever be made to account for differences in property and profit potential. CIR.Response/Reply 31-33. As to profit potential, this argument is irrelevant—no adjustments are necessary to render the profit potential similar, and none were applied in the primary version of Medtronic's CUT. Medtronic Br. 31-32 (describing adjustments). Regardless, the Commissioner identifies no authority categorically prohibiting adjustments that account for differences in property or profit potential,

---

[4] The Commissioner at times asserts a CUT must involve "the transfer of the *same intangible.*" CIR.Response/Reply 5. The regulatory text decrees otherwise. § 1.482-4(c)(2)(iii)(B).

Appellate Case: 23-3281     Page: 14     Date Filed: 06/06/2024 Entry ID: 5401532

and nothing in the regulations or any court decision limits adjustments to particular aspects of comparability.

As to the regulations:  Section 1.482-4(c)(2)(iii)(A) provides that "[t]he degree of comparability between controlled and uncontrolled transactions is determined by applying the comparability provisions of § 1.482-1(d)."  Section 1.482-1(d)(2), in turn, permits adjustments to be made for even "material differences between the controlled and uncontrolled transactions."  Thus, even important or significant differences can be adjusted for.  That is for good reason.  Transfer pricing invariably involves adjustments; if it did not, the regulations would permit use of only identical prior transactions.  The regulations, however, require only transactions involving "*comparable* intangible property," and extensively discuss how adjustments may improve the degree of comparability (and thus reliability) of a CUT.  § 1.482-4(c) (emphasis added).  The overarching "best method rule" confirms the relevance of adjustments, instructing that "the degree of comparability" must "tak[e] into account" the § 1.482-1(d)(3) comparability factors "*after* making adjustments for differences, as described in § 1.482-1(d)(2)"—the very provision requiring adjustments for material differences.  § 1.482-1(c)(2)(i) (emphasis added).

IRS guidance confirms what the regulations say: "in most cases identical transactions between unrelated parties will not be located, and it is therefore

Appellate Case: 23-3281     Page: 15     Date Filed: 06/06/2024 Entry ID: 5401532

appropriate to consider uncontrolled transactions that are comparable rather than identical." 59 Fed. Reg. at 34,976. The same guidance addresses adjustments: "if there are *material* differences between the transactions, adjustments *must* be made to account for such differences if," as here, "the effect of the differences can be ascertained with sufficient accuracy to improve the reliability of the results." *Id.* at 34,977 (emphasis added). Taken together, "the final regulations are intended to maximize the extent to which relevant information may be taken into account," including "so-called 'inexact' comparables." *Id.* at 34,975-34,976; *see also id.* (best method rule is concerned with "reliability rather than accuracy," unlike prior regulations).

Unsurprisingly, adjustments are a ubiquitous, well-accepted feature of transfer pricing. *See generally Amazon.Com, Inc. v. C.I.R.*, 148 T.C. 108, 109 (2017) (adopting CUT with adjustments), *aff'd*, 934 F.3d 976 (9th Cir. 2019); *Veritas Software Corp. v. C.I.R.*, 133 T.C. 297, 336 (2009) (same). The Tax Court here thus rejected the Commissioner's categorical position out of hand, instead evaluating the reliability of adjustments, including for know-how and profit potential. Add.137, 206. This Court also "recognize[d]" the Tax Court's "7% adjustment for the 'know how'" and "2.5% adjustment to account for the differences in licensed products," but remanded for "additional findings regarding the comparability of the remaining intangibles" without adopting the

- 13 -

Commissioner's categorical position or questioning the permissibility of *ever* using adjustments. *Medtronic*, 900 F.3d at 615. Under the Commissioner's view, the remand would have been pointless because the Tax Court's determination that adjustments were required would itself have precluded comparability. Moreover, even the Commissioner uses adjustments for profit potential to improve a CUT when it suits the IRS's purposes. *See, e.g.*, Add.165 (Commissioner "accepted the CUT method identified by [Medtronic]" in an MOU after Commissioner "adjusted the transactions to increase 'their profit potential'").

The Commissioner is therefore left to argue that the regulations' acknowledgement that adjustments *can* be made for some differences ("circumstances") means they cannot be made for others (property or profit potential). CIR.Response/Reply 32. But the regulations provide—indeed require—far more flexibility, stating that "[i]f there are material differences between the controlled and uncontrolled transactions, adjustments must be made," and defining "a material difference" as any difference "that would materially affect the measure of an arm's length result under the method being applied." § 1.482-1(d)(2). The regulatory text governs this case, and the IRS's contrary interpretation would upend settled transfer-pricing practices.

- 14 -

### B. The Pacesetter Agreement is a CUT

Once these baseless arguments regarding the permissibility of adjustments are set aside, the Commissioner cannot seriously dispute that the Pacesetter Agreement and Medtronic P.R. license are comparable.

#### 1. The Pacesetter Agreement and Medtronic P.R. license involved comparable property

Contrary to the Commissioner's claim, the Tax Court did not conclude "that the two agreements involved almost completely different intangibles." CIR.Response/Reply 23. The court instead found that "[t]he Pacesetter and the MPROC licenses include comparable products," Add.176, and in contrast to the Tax Court proceedings, the Commissioner now no longer disputes the comparability of the main licensed property—the patents.

The Commissioner's comparability argument thus turns on the premise that *additional*, less-important non-patent intangibles licensed to Medtronic P.R. but not Pacesetter somehow render the agreements *in*-comparable. Comparability, however, requires that property "[b]e used in connection with similar products or processes within the same general industry or market." § 1.482-4(c)(2)(iii)(B)(1)(i). That is indisputably the case for the non-patent intangibles, which were used directly alongside the patents to manufacture Devices and Leads. CIR.Response/Reply 25. The Tax Court's one-sentence reference to non-patent intangibles when evaluating comparability entirely ignored this critical "in

- 15 -

connection with" standard, and the decision never addressed why (or how) the addition of less-important, complementary intangibles would fail this standard. Add.176. That, combined with the Tax Court's flatly incorrect conclusion about the number of patents licensed (Medtronic Br. 51), requires reversal.

As to the Commissioner's argument that the Pacesetter Agreement cannot be used to value property beyond patents, extensive evidence demonstrates that know-how and regulatory approvals had relatively little value compared to the patents licensed to Pacesetter and Medtronic P.R., allowing the earlier agreement's rate to reliably define the outer limit of any additional royalty. Medtronic Br. 51-52; Med.Supp.App.50-56; Med.Supp.App.68-71 ("the implicit royalty rate for know-how is generally lower than the royalty rate for patents related to that know-how" because of the relatively greater value of patents); Med.Supp.App.38 (regulatory approval process was a "routine function[]" that Medtronic could "outsource to unrelated third parties"). Scholarship from the Commissioner's own expert confirmed the point, finding that companies value patents more highly than know-how or other intangible property. Med.Supp.App.118-122; Med.Supp.App.220-227; *see also* Med.Supp.App.78-79, 90-91 (IRS expert's study showed "median royalty rate premium for know-how ... is 1.5%"). The Commissioner identifies nothing supporting his view, latent for most of the last decade, that know-how or regulatory approvals were somehow more valuable than Medtronic's entire CRDM

- 16 -

patent portfolio or seminal industry patents, as would be necessary to render the Pacesetter Agreement's royalty rate an *unreliable* ceiling for valuing the additional intangibles.

The Commissioner also ignores extensive evidence and Tax Court findings regarding Medtronic P.R.'s contributions to know-how and regulatory approvals, which preclude assigning the entirety of any limited value of those forms of intangible property to Medtronic US. *See* Medtronic Br. 23, 27, 31-32, 51-52. As Medtronic's expert explained, "[e]verything having to do with really high-volume manufacturing, which is essential to Medtronic's success, is going to flow from MPROC to Medtronic." Med.Supp.App.165. And as the Tax Court found, given "the close relationship between Medtronic US and [Medtronic P.R.]," "[e]ach party benefited from the know-how of the other." Add.127. The Commissioner dismisses these contributions by reference to a dispute over the 2002 reorganization of Medtronic's Puerto Rican operations. The record demonstrated why that accusation misses the mark, however: Know-how is quickly developed and has a short shelf-life—indeed, that is part of why it is less valued than patents. *See* Medtronic Br. 20 (describing Pacesetter's reverse-engineering of Medtronic's know-how in under a year). The Tax Court's findings on Medtronic P.R.'s contributions specifically concern the later tax years at issue.

- 17 -

### 2. The property licensed in the Pacesetter Agreement and to Medtronic P.R. had similar profit potential

Like the Tax Court, the Commissioner continues to cite analysis purportedly showing that Medtronic's operations in 2005-2006 were more profitable than Pacesetter's over a decade earlier. But the Tax Court and Commissioner both ignore entirely *why* that difference exists and whether it has any connection to valuation of the intangibles. *Compare* Medtronic Br. 53-55, *with* CIR.Response/Reply 23-24, 28. To the extent it concerns Medtronic's unique success in the market, even the Commissioner's expert recognized that it derives in significant part from Medtronic's trademark, component manufacturing, and distribution, all of which played important roles in generating higher profit potential. CIR.App.541, 548. But those functions have already been priced at arm's length through other intercompany agreements. Medtronic P.R. thus already pays for that profit potential, rendering the comparison irrelevant to valuation of the intellectual-property license. *See* Medtronic Br. 31; Med.Supp.App.192-193. Similarly, to the extent any profit-potential difference derives from the quality of the Devices and Leads, the Commissioner ignores the dominant role that Medtronic P.R. played in generating those higher profits through ensuring quality. Medtronic Br. 15-19; Add.10, 25-34, 40-45, 99-105, 117; Med.Supp.App.153

("[T]he finished good manufacturing process that MPROC was doing is an important contributor to value").[5]

Finally, any supposed differences between the early 1990s and the 2005-2006 tax years were rendered irrelevant by the terms of the Pacesetter Agreement itself. Medtronic Br. 53-55. The maximum-rate clause accounts for any future profit-potential differences because the 15% maximum rate applied into the tax years at issue. Med.App.653-654. Said otherwise, Medtronic agreed at arm's length that the 15% rate was sufficient to license patents in the future with greater profit potential. And although the clause concerned patents, the record conclusively demonstrates that patents were far more valuable than the other licensed property, non-patent intangibles were rarely licensed, and when they were the rates were significantly below those for patents. *See supra* pp.16-17; *see also*, *e.g.*, Med.Supp.App.63-64. So a model starting from that maximum rate captures the contemporaneous profit potential of the property licensed to Medtronic P.R. without the need for adjustments.

---

[5]    The Commissioner also inexplicably claims that "Medtronic's exceptional profitability was largely because of its nonpatent intangibles." CIR.Response/Reply 10. None of the materials cited for that proposition say anything of the sort; for example, the referenced expert testimony expressly notes the role of Medtronic's *distribution, component manufacturing, and trademark* in the enterprise's profitability. CIR.App.541, 548. Instead, as the Tax Court found, Medtronic P.R.'s contributions to quality primarily drove profitability.

- 19 -

The Pacesetter Agreement and Medtronic P.R. license thus have sufficiently similar profit potential to qualify as a CUT, especially considering that the IRS "relaxed" the profit-potential requirement in the regulations "to permit more frequent use of [the CUT] method." 59 Fed. Reg. at 34,983.

### 3. Medtronic P.R.'s relative share of overall costs does not undermine comparability or violate the "commensurate with income" requirement

The Commissioner makes repeated reference to Medtronic P.R.'s share of the enterprise's overall costs, but that figure is irrelevant to comparability. *See, e.g.*, CIR.Response/Reply 21. The Commissioner's own expert admitted that businesses in the implantable medical-device industry incur a wide variety of costs; profits can vary wildly regardless of costs; and a dollar of cost bears no relation to a dollar of profits. Med.Supp.App.199-210. Said otherwise, "'costs are generally not a good proxy for intangible value.'" Med.Supp.App.211-214; *accord* Med.Supp.App.131 (conceding "costs and profits would not be expected to be strictly proportional," and "[t]his is particularly true when intangible assets are important drivers of profits"). So as Medtronic's expert explained, considering Medtronic P.R.'s share of costs "makes no economic sense," and "there's nothing in economics that says [profits and costs] should match." Med.Supp.App.179, 182-183; Med.Supp.App.159. Regardless, as Medtronic's expert showed, once the

correct costs are evaluated in connection with the single intercompany license now at issue, Medtronic P.R. bore most of the costs. *See* Med.Supp.App.116-117.

For similar reasons, the CUT is consistent with the "commensurate with income" standard. The Commissioner advances no distinct argument on this point, again relying on Medtronic P.R.'s purported share of costs. CIR.Response/Reply 12-13, 21. But the IRS "concluded that Congress intended no departure from the arm's length standard" through the "commensurate with income" language, which "does not specify a specific method or certain range of profits" or "replace the arm's-length standard." Add.119, 171-172, 190. Whether the CUT produces a valuation "commensurate with income" thus turns on the same comparability analysis described above and in Medtronic's first brief.[6]

### C. The Commissioner's CPM is less reliable than Medtronic's CUT

The Commissioner primarily argues the Pacesetter Agreement cannot be a CUT, so the CPM must be the best method. CIR.Response/Reply 34-36. But the CUT is eligible to be and in fact is the best method here. *Supra* pp.8-21. Regardless, the Tax Court correctly found the CPM cannot be the best method— and it is not an overstatement to call it the worst one.

---

[6] The Commissioner claims the Tax Court concluded that Medtronic's CUT violated the commensurate-with-income requirement, but it made no such finding. Instead, the Tax Court referenced the standard only to justify applying an additional adjustment to Medtronic's unspecified method. Add.208.

- 21 -

Start with Medtronic's business and the available data. Companies that include even potentially comparable functions are vertically integrated, with no segmented financial data to perform a reliable CPM. Med.Supp.App.103-104. That is because finished-device manufacturing is a core function in the Class III medical-device industry generally (and the CRDM industry particularly), so relevant companies retain that function in-house. Med.Supp.App.142; Med.Supp.App.99-103. Standalone financial data for finished manufacturing is thus not available, generally precluding a CPM. *See, e.g.*, Add.189 (Commissioner's expert's concession that financial data pertaining to Class III devices could not be extracted from comparators' records).

A reliable CPM, moreover, requires isolating the profits of a "tested party." § 1.482-5(b)(2). Because of the importance of obtaining discrete, reliable data, the regulations provide that "in most cases the tested party will be the least complex of the controlled taxpayers and will not own valuable intangible property or unique assets that distinguish it from potential uncontrolled comparables." *Id.* When the tested party does own "highly valuable intangibles," it will generally "not be possible to locate an uncontrolled comparable that owns similarly valuable intangible property." 59 Fed. Reg. at 34,985-34,986. That is the case here because, as the Tax Court found, Medtronic P.R.'s intangible property substantially contributed to Medtronic's success. *Supra* pp.17-18; Add.25-34, 112-

- 22 -

114.  And the record demonstrated that Medtronic P.R.'s intangibles were highly valuable.  Med.Supp.App.56-61; *see also* Add.40-45, 99-105, 117.  These findings make a CPM an especially poor fit, and support the Tax Court's conclusion that it could not be the best method.  The contrast to *Coca-Cola* is instructive.  That case was "particularly susceptible to a CPM analysis because petitioner owned virtually all the intangible assets needed to produce and sell the Company's beverages," while the tested party "owned few (if any) valuable intangibles."  *Coca-Cola*, 155 T.C. at 219.  As the Tax Court found, that is not true for Medtronic P.R.

The Commissioner, for his part, continues to dispute the Tax Court's findings regarding the incomparable "implantables," but still identifies no clear error.

*First*, the implantables cannot be used to infer Medtronic P.R.'s profits because they performed many less-profitable functions and produced products less profitable than Devices and Leads.  Medtronic Br. 55-63.  The Commissioner responds by listing features of Medtronic P.R. he says the implantables shared, then repeatedly asserts "the Tax Court did not find otherwise."  *E.g.*, CIR.Response/Reply 37-38, 48.  But he elides what the Tax Court *did* find: (a) the implantables "have fundamentally different asset bases and involve different functions and risks from those of a class III medical device manufacturer" like Medtronic P.R., (b) "[n]one of the five made similar cardio or neuro devices" like

- 23 -

Medtronic P.R., (c) "none of the five companies performed only the function of finished device manufacturing" like Medtronic P.R., and (d) "[a]ll five performed some combination of ... R&D, component manufacturing[,] finished medical device manufacturing, and distribution," unlike Medtronic P.R.  Add.188.  As a result, the Tax Court correctly found the implantables are "not good enough comparables to result in the CPM's being the best method."  *Id.*  Contrast these differences to those asserted by the Commissioner with respect to the CUT, where all now agree the comparable transaction involves the *same* core patents licensed under comparable circumstances into the *same* tax years.  The better method is obvious.

The Commissioner also misleadingly references a Medtronic expert supposedly characterizing the implantables' *products* as "'close cousins' of the products manufactured by Medtronic-P.R."  CIR.Response/Reply 37.  He said no such thing, instead testifying that "[t]he orthopedic *companies* were close cousins of cardiac rhythm management from a *structural* standpoint" when comparing them to the overall Medtronic enterprise.  CIR.App.1125 (emphasis added); *see also* CIR.App.1126 (using phrase "close cousins" when comparing Medtronic's overall profitability to orthopedic comparators).  As he explained, "all of these companies are fully integrated medical technology companies that have the full breadth of responsibilities of a separate company," whereas Medtronic P.R. "is just

a part of Medtronic, so it's really quite different." CIR.App.1125. Of course, that is Medtronic's point, and why the CPM is necessarily unreliable.

*Second*, the Commissioner resists the Tax Court's findings regarding product-liability risks and expenses. CIR.Response/Reply 45-50. The Tax Court found Medtronic P.R. bore *all* product-liability risks, which ran into hundreds of millions of dollars. Medtronic Br. 61-62; Add.185-186. The finding that *all* risk and product-liability expense should be allocated to Medtronic P.R., substantiated by reference to the costs of past recalls, was exactly what this Court directed. The Commissioner asserts that any differences in risks incurred by Medtronic P.R. and the implantables should have been controlled with adjustments, but the Commissioner offered only one—$25 million—and the Tax Court rejected it as "not in line with the costs associated with prior recalls" and not "enough to account for [Medtronic P.R.'s] role regarding product liability claims." Add.185-186; § 1.482-5(c)(2)(ii) ("[C]omparability under [the CPM] is particularly dependent on ... risks assumed.").[7] Again, the CUT suffers from none of these defects; both

---

[7] The Commissioner repeatedly criticizes the Tax Court for not making adjustments to the CPM (*see* CIR.Response/Reply 35, 45, 50-57), but the Commissioner offered only one—this product-liability adjustment—which the court considered and rightly rejected. More broadly, the IRS's appellate musings urging as "reliable" so many—and such broad, complex, and subjective— adjustments under the CPM, contrasted with its criticisms of relatively narrow, simple adjustments under the CUT and unspecified methods, further illustrates that the IRS's litigating position is driven not by law but by outcome.

- 25 -

Pacesetter and Medtronic P.R. were responsible for problems with manufactured products. Add.184.

*Third*, the Commissioner attempts to deflect the Tax Court's rejection of the return-on-asset (ROA) metric in the IRS's CPM, but grossly misstates the record, claiming the Tax Court "did not question the profit-level indicator itself." CIR.Response/Reply 50-51. The Tax Court, however, found the ROA "ignores valuable intangible assets," "agree[d]" with Medtronic's experts' criticisms of the ROA, and ultimately concluded that the use of ROA was "misleading." Add.114. These statements were in the first decision, but the Tax Court's subsequent opinion adopted them wholesale—"[t]he problems that *Medtronic I* addressed regarding [the] CPM remain the same." Add.188. And those findings were amply supported, because the ROA failed to capture Medtronic P.R.'s contributions to Medtronic and was *never* used in the Devices and Leads industry. Medtronic Br. 58-59; *accord* Add.113-114, 199, 207; Med.Supp.App.111 (ROA "do[es] not reflect the value of [Medtronic P.R.'s] technical know-how, process improvements, and MPROC's workforce in place"). The CUT (once more) entirely avoids such problems by *directly* measuring how industry participants actually valued the property. *Supra* pp.15-17.

Appellate Case: 23-3281    Page: 29    Date Filed: 06/06/2024 Entry ID: 5401532

### III. MEDTRONIC'S UNSPECIFIED METHOD IS THE NEXT BEST METHOD

If the Court concludes the CUT is not the best method, an unspecified method was next best. Whether in the form Medtronic proposed or adopted by the Tax Court, that approach measures the intangible property (far) more reliably than the CPM. The Commissioner's contrary arguments again distort the law, evidence, and Tax Court's decisions.

The Commissioner's primary contention is that incorporating the Pacesetter Agreement violates the regulations applicable to CUTs and, assertedly, the regulations on unspecified methods forbid that. CIR.Response/Reply 60-62. That is plainly wrong. Even setting aside that the Pacesetter Agreement is a CUT and all agree that it constitutes the *only* evidence in this case directly valuing intangibles licensed to Medtronic P.R., *supra* pp.8-10, the Commissioner identifies no court that has ever adopted his illogical reading of the regulations, nor anything in the regulatory text supporting such a view. In contrast to § 1.482-1, which sets forth the general comparability factors that are applicable to all methods, § 1.482-4 sets out distinct requirements for each method to price intangible property. Subsection (c) of 1.482-4 governs CUTs—and *only* CUTs. It provides that the application of the comparability factors "*under the comparable uncontrolled transaction method*" is specified in § 1.482-4(c). Nothing in Subsection (c),

Appellate Case: 23-3281     Page: 30     Date Filed: 06/06/2024 Entry ID: 5401532

however, states that its requirements are also applicable to unspecified methods, which are subject to a distinct set of requirements in Subsection (d).

Resisting plain language, the Commissioner invents a comparability requirement that hopscotches among regulatory provisions, borrowing only words needed for his preferred outcome. But even then, the argument rests on atextual interpretations. Start with § 1.482-1(d)(1)'s statement that "the comparability of transactions … must be evaluated considering all factors that could affect prices or profits." CIR.Response/Reply 60. That admonition is entirely consistent with Medtronic's unspecified method, which analyzes the Pacesetter Agreement and CPM before making adjustments to reflect factors "that could affect prices or profits." *Id*. That same section's allowance that "*each method* requires analysis of all of the factors that affect comparability *under that method*" is likewise consistent with Medtronic's unspecified method, which takes into account "all of the factors that affect comparability under" *an unspecified method. Id*. (second emphases added). Neither provision cited by the Commissioner says anything about applying CUT-specific regulatory requirements to unspecified methods.

The Commissioner also claims "Medtronic and the Tax Court recognized this basic point with regard to step two of the Unspecified Method" because they determined the CPM-specific rules "applied to the CPM-component of the Unspecified Method." CIR.Response/Reply 61. Not so. Medtronic and the court

noted only that "[o]ne of the examples provided in the regulations of the CPM method allows for adjustments for asset intensity," then applied such an adjustment to improve the CPM's reliability. Add.199. Nothing in Medtronic's unspecified method or the opinion states that the CPM-specific regulations *restricted* the unspecified method; cross-referencing an example to support the recognized *utility* of an adjustment is not to the contrary. The regulations applicable to all methods that the Commissioner cites expressly contemplate a variety of modifications, moreover, noting that "comparability adjustments may be necessary" to account for differences between "taxpayers" under any method. § 1.482-1(d)(3).

The Commissioner nevertheless contends that applying the method-specific rules would "not 'preclude use of the unspecified method altogether' or prohibit the use of unspecified methods that incorporate a specified method." CIR.Response/Reply 62. But his example disproves his point. He says "an unspecified method could incorporate a transaction that qualifies as a CUT under the relevant rules but do so in a way that allows the unspecified method to be more reliable than the CUT method standing alone." CIR.Response/Reply 62-63. How that would function is left unsaid, perhaps because it makes no sense. Any such "unspecified method" would just be a CUT with adjustments.

The Commissioner fares no better with his assertion that the Tax Court failed to evaluate Medtronic US's "realistic alternatives." CIR.Response/Reply

66-67. The Tax Court found Medtronic P.R.'s role was "unique," Add.204, a point the Commissioner does not dispute (any more). Moreover, the Commissioner concedes that "companies in Medtronic's industry do not license their nonpatent intangibles," CIR.Response/Reply 4, as would be required to "replac[e] Medtronic P.R.," CIR.Response/Reply 67. Although the Commissioner now asserts that Medtronic P.R. could have been replaced with another Medtronic-controlled entity, the record demonstrated and the Tax Court found that no such alternatives were available. Add.107-108 (describing limitations of Medtronic's Swiss facility).

Finally, the Commissioner disputes the adjustments the Tax Court and Medtronic employed, but identifies nothing that would undermine their reliability. As to Step One, the Commissioner claims that adjustments to the CUT to account for nonpatent intangibles licensed to Medtronic P.R. were too speculative. CIR.Response/Reply 68. That is both wrong, *supra* pp.15-20, and irrelevant, given that the Tax Court did not apply any adjustments to Medtronic's CUT in Step One, Add.210. As to Step Two, the Commissioner asserts that "Medtronic has *no response* to the Tax Court's adverse findings regarding it asset adjustment." CIR.Response/Reply 68. But again, the Tax Court applied the second step as Medtronic proposed, including the asset adjustment on which the Commissioner claims there were "adverse findings." Add.210. In any event, the regulations permit such adjustments, *see* § 1.482-5(e) (Example 5(ii)); § 1.482-5(d)(6); the

- 30 -

Commissioner's expert attempted his own insufficient one, Med.Supp.App.129-130; and Medtronic's was needed to reliably apply the CPM, Add.110 (finding that the comparable companies had different assets and functions than Medtronic P.R.). As to Step Three, the Commissioner rehashes his arguments about Medtronic P.R.'s contributions to Medtronic's operations and the relative allocation of product-liability risks. CIR.Response/Reply 71-73. Those assertions are meritless and belied by the record. *Supra* pp.22-26.

Ultimately, the Commissioner's critiques of the unspecified method reflect his stubborn commitment to his CPM, no matter the circumstances, no matter how this case has changed, and even in the face of the Tax Court's specific invitation for help. But especially given the IRS's own statement that the CPM should be a method of last resort under the regulations, Medtronic's unspecified method is clearly better than the ill-conceived CPM here.

## CONCLUSION

The Court should reverse the Tax Court's conclusion that Medtronic's CUT is not the best method. Alternatively, the Court should reverse the Tax Court's adjustments at Step Three of Medtronic's unspecified method and direct the Tax Court to assign a greater portion of the residual profits to Medtronic P.R. In no event should it adopt the Commissioner's CPM, which is arbitrary, capricious, and less reliable than either the CUT or an unspecified method.

Appellate Case: 23-3281     Page: 34     Date Filed: 06/06/2024 Entry ID: 5401532

June 6, 2024

Respectfully submitted,

/s/ Noah A. Levine

Rajiv Madan

Noah A. Levine

Skadden, Arps, Slate, Meagher,

Alex W. Miller

   Flom llp

Wilmer Cutler Pickering

1440 New York Avenue, N.W.

   Hale and Dorr llp

Washington, DC 20005

7 World Trade Center

(202) 371-7020

250 Greenwich Street

New York, NY 10007

(212) 230-8800

noah.levine@wilmerhale.com

- 32 -

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word for Microsoft 365), the brief contains 6,498 words, excluding the portions exempted by Rule 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 in 14-point proportionally spaced Times New Roman font.

This brief also complies with the electronic-filing requirements of Circuit Rule 28A(h)(2) because it was scanned for viruses using CylancePROTECT and no virus was detected.

/s/ Noah A. Levine
NOAH A. LEVINE

## CERTIFICATE OF SERVICE

On this 6th day of June, 2024, I electronically filed the foregoing using the Court's appellate CM/ECF system. Within the period required by Circuit Rule 28A(d), I will cause ten paper copies of this brief to be filed with the Court and will also serve the brief by first-class mail upon counsel for the appellants.

/s/ Noah A. Levine
NOAH A. LEVINE